[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ANDDEFENDANT INSURANCE COMPANIES' CROSS MOTIONS FOR SUMMARY JUDGMENT
This is an action for insurance coverage pursuant to §38a-321 of the general; statutes. The claim against the company arises out of an alleged fall by the plaintiff on a gangway leading to a dock at a yacht club located at 30 Thimble Island Road in Branford. In June 1993 the plaintiff brought suit against CT Page 4595 the owner of the premises, the lessee MacFredee Inc. d/b/a Thimble Island Cafe and a principle of MacFredee Inc., Darryl Schram for the damages arising out of his fall. The plaintiff obtained a default judgment against these defendants which they failed to appeal, the plaintiff has been unable to collect on the judgment and therefore instituted this action under § 38a-321.
The defendant RLI Insurance Company wrote a comprehensive general liability policy for MacFredee Inc. and Mr. Schram which provided coverage up to $10,000 if the policy applied and the defendant National Union Fire Insurance Company provided excess coverage for them of $1,000,000. Both policies were in effect on the date of the plaintiff's accident. The policies provided coverage for bodily injury and property damage.
There is a dispute over coverage. The plaintiff argues that the policies clearly provided coverage for his injuries. The defendant companies maintain just as strenuously that the policies did not provide coverage for these injuries. Not surprisingly therefore both sides have filed motions for summary judgment. InAetna Life Casualty Co. v. Bulaong, 218 Conn. 51, 58 (1991) the court said:
 "Interpretation of an insurance policy like the interpretation of other written contracts involves a determination of the intent of the parties as expressed by the language of the policy. . . . Unlike certain other contracts, however, where absent statutory warranty or definitive contract language the intent of the parties and thus the meaning of the contract is a factual question subject to limited appellate review; . . . construction of a contract of insurance presents a question of law for the court which this court reviews de novo."
The plaintiff argues that this case is suited for summary judgment because it does involve only issues of law concerning the scope of insurance coverage. The court must read the language of the policy and decide (1) whether the policies provide coverage for the injuries the plaintiff claims to have received on these premises and (2) whether those premises include the dock area where the plaintiff's fall occurred.
The defendant companies argue that it is not necessary to look beyond the express terms and provisions of the RLI policy CT Page 4596 for them to prevail but "even if the court were to consider extrinsic evidence in this case, all of the evidence demonstrates that it was not the intention of any individual or entity involved in the issuance of the RLI Policy that RLI provide coverage to a marina business" (p. 4 of brief). It is the defendant's contention that the plaintiff fell on the premises but at a separate business operation on those premises, a marina, separate that is from the business the company claims was, insured — a restaurant. The defendants note that in certain circumstances our courts have looked beyond the four corners of an insurance policy and examined the circumstances surrounding an insurance contract. Ceci v. National Indemnity Co., 225 Conn. 165,169, 173 (1994), Travelers' Insurance Co. v. Kulla,216 Conn. 390, 402 (1990), Cody v. Remington Electric Shavers,179 Conn. 494, 497 (1980); Roy v. Allstate Insurance Co.,34 Conn. Sup. 650, 653 (1978). What makes the task of insurance policy interpretation difficult, however, is that ordinary principles of contract interpretation have to be tempered or have to be applied within the context of another rule of construction mandated in insurance policy disputes over coverage. Thus a court cannot find an ambiguity in an insurance policy were none exists because it is not a court's function to write the terms of a policy or impose its own notions of fairness on parties to what is after all a contract. But as the Bulaong court noted that if policy language is ambiguous "the ambiguity must be resolved against the insurer," 218 Conn. at page 60.
I suppose one could say in light of that sacrosanct rule if a court has to resort to extrinsic evidence or go beyond the four corners of a policy to determine its meaning then it is ambiguous and the insured must necessarily prevail on every policy phrase that would require a resort to such means to interpret it.
The courts have however, used language which suggests iron clad presumptions do not control at least to the exclusion of the court having also to consider the situation the parties found themselves in at the time of contracting. Thus in Travellers Inc.Co. v. Kulla, at 216 Conn. p. 402 the court said in interpreting policy language we look "to the expectations of the purchaser of the policy. In Cody at 179 Conn. P. 497 the court said "the policyholder's expectations should be protected as long as they are objectively reasonable from the laymen's point of view." But the presumptive rule regarding ambiguity still operates because the courts seem concerned with the insured's expectations not the insurer's. The interpretive problem usually arises in the context CT Page 4597 of whether the insurer's expectations can be enforced in light of what it is argued is its too restrictive interpretation of policy language. In Roy v. Allstate Ins. Co., at 35 Conn. Sup. at page 653 the court said that in trying to interpret policy language it would look to what the insured would reasonably expect the contract to mean and "consider the intent of the insured in procuring insurance." That is, the intent of the insurance company in writing the policy is not mentioned by these cases as a factor to be considered, cf. Fancher v. Carson-Campbell Inc.,530 P.2d 1225, 1229 (Kan. 1975).
But there is an interesting tension in the cases created by language such as that used by the Ceci court at 225 Conn. at pages 168-170:
 "The provisions of the policy issued by the defendant cannot be construed in a vacuum." . . . they should be construed from the perspective of a reasonable layperson in the position of a purchaser of the policy . . . this analysis is necessarily fact orientated and is not based solely upon general propositions."
Thus according to Ceci the factual background and circumstances under which a policy was sought and issued can be taken into account by the courts when interpreting a policy. When this is coupled with a "reasonable layperson" standard the question becomes how does this affect the application of the rule requiring ambiguous language in the policy itself must be interpreted against the insurer.
Appleman, Insurance Law and Practice, Vol. 13 § 7403 appears to set forth the position of our court in light of Ceci
when it says at page 305:
 "The rule of strict construction against the insurer cannot apply unless there is some reasonable basis for doubt. Nor does the rule of strict construction affect the rule that contractor of insurance are to be construed as other contracts, taking all parts thereof together. These portions should be read as an entirety, giving each the significance which shows the intention of the contracting parties. Thus, the rule of favorable construction does not alter the doctrine that policies must be constructed to give effect to the language expressed therein and the intent CT Page 4598 of the contracting parties so as to reach a result consistent with the general purpose. The general objects of the insurance agreement control, avoiding strict and technical interpretation. And while if the language is ambiguous the policy is to be construed in a manner most favorable to the insured, it is also to be interpreted in the light of the circumstances in which it was issued and with due deference to common usage and understanding." (emphasis added).
The name of this policy describes its purposes. It is a commercial general liability policy. Businesses take out these policies to protect themselves against suits or claims of bodily injury or property damage that may be made against them by people injured on their premises. Of course the insured business would like to be covered in a territorial sense — they would want to be covered against all claims arising out of accidents or occurrences on the premises occupied by their business.
Insurance companies obviously sell these policies not with a charitable aim in mind but to make money.
If the commercial liability insurance market runs efficiently society reaps very real benefits. Injured people are compensated for their losses in a way that is affordable to the business on whose premises they were injured and to the industry of which that business is a part. Businesses do not have to cover out of their own pockets losses which otherwise could drive them into bankruptcy. The insurance industry whose policies accomplish these purposes are allowed to make a reasonable profit thus permitting them to stay in business themselves and perform their task of spreading the risk of loss to enable society to compensate individual claimants who suffer such loss.
Ideally businesses do not want to have to deal with policies which allow insurance companies to engage them in nit-picking battles over whether as to a particular loss it was caused by an accident which normally could be expected to occur in the particular activity in which the business is engaged.
Insurance companies on the other hand in order to be able to make a reasonable profit have to be able to rationally allocate risks. This is perhaps another way of saying they have to be able to some extent to predict risks. An insurance industry could not CT Page 4599 exist if business liability policies were drawn to cover all losses that occur on the premises with no regard given to the type of business conducted on the premises to determine premiums. How would the premiums be determined and the net result would be that low risk business would be financing high risk businesses.
Insurance companies have sought to deal with these problems. They have issued policies which only provide for liability coverage if the loss resulted from the type of activity normally associated with the activity or operations of the particular business they thought they were insuring. The following cases illustrate some of the approaches taken. Thus in HicksvilleMotors et al v. Merchants Mutual Insurance Co., 467 N.Y.S.2d 221 (1983) a lady was injured when an officer of Hicksville Motors set off a firecracker that hurt her. The policy was limited to accidents resulting from garage operation. The court found there was not coverage because "an act performed while in the course of garage duties is covered only if the act itself is garage business or necessary or incidental thereto," id., p. 221. InFidelity Casualty Co. of N.Y. v. Napelton Motor Sales Inc.,284 N.E.2d 26 (Ill. 1972) the plaintiff insurance company brought a declaratory judgment action to determine whether there was coverage for a minor child injured on the insured's premises. The child went with her parents to Napleton Motor Sales and wandered off to a back lot area where horses and ponies were kept. One of the ponies bit the child (fortunately her injury does not appear to be have been serious). In any event the trial court ruled and the appellate court agreed that there was no coverage under this policy. The court noted the explicit policy language that said the insurer would pay sums the insurer would "become obligated to pay because of bodily injury . . . caused by accident and arising out of the garage operation hazard." The court noted that there was no indication the ponies were used for promotional purposes by the garage. The court also noted that the mere fact that the insurer had knowledge of the horse raising activities would not bring such activities within coverage. Also the court held that the rule of construction that ambiguous phrases in a policy are interpreted against the insurer was not applicable. The rule "does not warrant a perversion of the language to create an ambiguity where none exists," id. p. 28, also see Royal GlobeInsurance Co. v. Dinan, 248 N.Y.S.2d 469, 471 (1964).
In Collabolletta v. Travelers' Ins. Co., 239 N.Y.S. 203 (1930) a child was injured upon a coal conveyor operated in connection with a coal business run by the insured. The court held there was CT Page 4600 no coverage under the policy.
The court appeared to be referring to explicit policy language when it held as a matter of law:
 . . . (2) that the injuries received by the infant plaintiff, upon the coal conveyor operated in connection with the coal business of the said assured, in the rear of the apartment premises mentioned in the policy and complaint, were not contemplated by the terms of the policy, the indemnity furnished by which to the assured, applied only to injuries resulting (a) from the ownership, care, maintenance, occupation, or use of the premises described in the declarations (of the assured) in the policy, or (b) from any business operations disclosed in the declarations as therein conducted by the assured. The declarations disclosed only (1) the location of the insured premises as being at 105 Columbus avenue, Tuckahoe, (2) that said premises were occupied by apartments of which (3) the assured occupied two apartments. There was not disclosure in the declarations, in express words or by necessary or any implication, to the effect that the insured premises contained a coal yard upon which the assured were conducting a coal business, selling goods to the public, as was subsequently claimed by the injured plaintiff to be the fact, id., p. 204.
The policy language in this case presents interesting problems if the just mentioned cases are used as a reference point. There is no explicit language in this policy saying that there shall only be coverage for an injury arising out of a particular business activity — here restaurant business activity.
There is a declarations page; it is entitled "Commercial General Liability Policy-Declarations. But the function of that page relative to the scope of coverage is not explicitly defined as it was apparently done in the Collabolletta case. At the top of the page under "named insured and mailing address" it says "Thimble Island Cafe, 30 Thimble Island Road, Branford, Connecticut, 06405." Halfway down the page there is a box with the following heading "Description of Business and Location of CT Page 4601 Premises." In that box there is a "Form of Business" heading with several boxes, individual, joint; venture etc. but none of them are checked. Immediately beneath that is the phrase "Business Description" and typed in is the word "Restaurant." Beneath that is the phrase "Location all premises you own, rent or occupy." Typed in is "As above." That refers to the previously quoted language under "Named Insured and Mailing Address." Note that the "Named insured" is listed as "Thimble Island Cafe"; at least in its American variety the word "cafe" can connotate an establishment that functions as a "restaurant." The next box on the declarations page is entitled "Premium." In that box under "classification" it says "Restaurant — with sales of alcoholic beverages less than 75% of the total annual receipts." Under "Premium Basis" it says "per each $1,000 sales" which must related back to the classification of the "named insured" as a "restaurant" and thus refer to its sales as a restaurant business.
There is a part of this policy entitled "Commercial General Liability Coverage Form." Its opening paragraph reads:
 "Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered."
Section 6 of the document is entitled "Representations." It reads as follows:
"By accepting this policy you agree:
 (a) The statements in the declarations are accurate and complete;
 (b) Those statements are based upon representations you made to us; and
 (c) We have issued this policy in reliance upon your representations."
Given this policy language the question presented is what would the "reasonable layperson" surmise as to coverage under this policy? Would such a "reasonable" person expect that he or she had coverage for an accident not arising out restaurant business but resulting from a fall on a gangway leading to a marina area which operates as a business on the same premises as CT Page 4602 the restaurant? As a further aid in answering this question theCeci court as noted indicated the policy cannot "be construed in a vacuum," the policy provisions must be construed from the perspective of a reasonable layperson in the position of a purchaser of the policy. . . . This analysis is necessarily fact orientated . . . 225 Conn. at pages 168-170. It could be argued that Ceci invites and Section 6 of the addendum to the policy seem to direct the reasonable layperson to direct him or herself to the application for insurance coverage which one would think would help that person and a court define the reasonable scope of his or her expectations.
For example the Pennsylvania courts just as religiously as ours follow the rules that if more than one reasonable construction exists, construction of the policy that favors coverage must apply and if ambiguity exists as to an exception to general liability, language must be strictly construed against the insurer Penn-Air Inc. v. Indemnity Ins. Co. of North America,269 A.2d 19, 22 (Pa, 1970), Frisch v. State Farm Fire Gas Co.,275 A.2d 849, 851 (Pa, 1971). However as Celley v. Mutual BenefitHealth Accident Ass'n., 324 A.2d 430, 435 (1974) holds:
 . . . "where an ambiguity can be removed by an interpretation placed upon the language by the parties, this approach does not apply. . . . Rather the parties' interpretation will govern. . . . To prove the parties interpretation, evidence of prior and contemporaneous negotiations is admissible. . . . This evidence is not precluded by the parol evidence rule, for it does not contradict or change the policy but merely develops and explains the ambiguity. . . . It is to be noted, however, that `the meaning to be discovered and applied (with the aid of parole evidence is that which each party had reason to know would be given to the words by the other party'", quoting from 3A Corbin, Contracts
§ 579 at pp. 418-419.
In Wilkinson v. USF G Co. of Baltimore, 396 S.W.2d 86, 87
(Tenn. 1965) the court referred to the application for insurance in trying to ascertain coverage under the policy.
What then are the factual circumstances surrounding the procurement of insurance in this case? Since commercial liability insurance is involved one would think that reasonableness of CT Page 4603 expectation should be determined by the type of business run by the insured and also by communications it or an agent made to the insured. Part of those factual circumstances (so that the contract of insurance need not be interpreted in a "vacuum" a laCeci) must be the application of insurance the insured made to procure the insurance. The court will now examine the application for insurance — what else can the "fact orientated" inquiry be directed to under the circumstances of this case.
In 1992 RLI and other insurance companies had a contract with Walter Kaye/Program Brokerage to provide certain limits of restaurant insurance to restaurants who were members of the Associated Restaurant Management Trust. In that year MacFredee d/b/a Thimble Island Cafe by a Connecticut insurance broker Max Fittelson Son applied through Kaye for commercial insurance with the Associated Management Insurance Trust. An employee of the Connecticut broker, Valerie Zalman, prepared the application on behalf of the Thimble Island Cafe.[1]
The application consists of several pages and is a printed form. On the first page at the top appears the title "Associated Restaurant Management Insurance Trust" with an address in Rhode Island. Beneath that and heading the form is the phrase "Application for Restaurant Insurance Program." The first information sought is "Restaurant Name" — "Thimble Island Cafe is filled in the space provided for on the document. Another question on the form is "Years of Restaurant Experience", "At this location," "As an Owner." The owner, Mr. Schram filled in 25 years as to the first inquiry and 5 years as to the last two. "Hours of operation" presumably refers to hours of restaurant operation since the next inquiry is "Hours of bar operation (if different from above)." The form asks if "entertainment" is provided. The application indicated "yes" and the "type" of entertainment was listed as "Piano Player." To the question "Is there a dance floor?" The answer provided was "No." The application also asks "Are there any doormen or bouncers?" — no answer was provided to this question.
On the second page of the application it says "Additional Exposures for consideration: (Dwelling, on premises Bldg., Office, etc.) Please specify amount, where located and include description:" Ms. Zalman wrote in as to amount $50,000 — on "Framed Cabanas." Directly below that is written: "There is pool exposure — I'm looking for G.L. coverage from another source." CT Page 4604
The application then goes on to make inquiries that obviously appear directed to the type of building used for the restaurant — they ask for example the type of construction, age of building, whether there is single occupancy, whether the wiring has been updated etc. The next to the last page is entitled "Liability Section." The application has the phrase "Food Sales" and "Liquor Sales" and a "Total." It then says "Catering (Inside)" to which the answer written in was "No." Then there appears the inquiry "Square Ft. of Restaurant" — "3,000" is written in; this is followed "Sq. Ft. of Parking Lot" — "115 cars" is written in on a line next to this inquiry. Interestingly there is another inquiry which asks "Are there any on premises or off premises exposures you wish considered (Gift shop, office, premises sign coverage, baker, deli, etc?) Please describe and give receipts." The answer is "No."
If we examine the application itself there does not appear to be much question that the only reasonable expectation that this insured had when the policy was applied for was that a standard commercial liability policy would be issued for accidents arising out of the restaurant business. The whole focus of the application is on the operation of such a business. It is difficult to even posit let alone accept as an operative fact that any insured submitting this application itself or through an agent would not surmise that the company was solely concerned with ascertaining the risks it would run by giving a policy to a restaurant, and not restaurants in general but the operations of this restaurant qua restaurant in light of its past operations as and expected operations in the future as a restaurant.
True as the plaintiff notes the eleven "cabanas" are covered under this policy but the application lists them as "additional" coverage. Where the application refers to on or off premises exposures the insured wished to be considered it asks for a description and the receipts of these exposures. Interestingly it lists among other things "gift shops," "bakery," "deli." These "exposures" like marinas are not "restaurants." The insured's agent indicate "no" to any such coverage. Would a reasonable insured believe that if at this point in the application, he did not list a gift shop or a bakery or a marina and did not list receipts for such operations it would in any event be covered? To pose the question provides the answer.
Given this interpretation of the application and what the insured should be able to surmise from its contents as to the CT Page 4605 scope of coverage, at least as contributing to that "perspective of a reasonable layperson" necessary to avoid a non-fact orientated "vacuum" in interpreting this policy, Ceci,225 Conn. at pp. 168-169, the policy language cannot be viewed as ambiguous and cannot be taken to have encouraged any false expectations on the part of the insured. In fact viewing the circumstances under which this policy was procured, one of which must be the application for insurance itself, there is not even a need perhaps to go as far as Celley v. Mutual Benefit Health Accident Ass'n., supra. That is, resort to the application here does not so much clear up an ambiguity but rather makes clear that the hypothetical reasonable layperson could not entertain any ambiguity that the policy language would cover a marina.
Looked at from another perspective, from that of the policy language itself, the position advocated by the plaintiff would require the court to ignore the significance of all the policy provisions relevant to this issue — characterization of business as a "restaurant," calculation of premiums based on restaurant business, operation of paragraph 6 of Section IV of the policy. Ignoring the latter policy language would in effect posit a hypothetical "reasonable layperson" who is to be allowed to retain that status without so much as a blush while arguing that listing his or her business as a "restaurant" in the declarations page of a commercial liability policy would not be the, type of "representation" an insurance company could reasonably be expected to rely upon when trying to ascertaining whether there should be coverage for an accident not at a restaurant but at a marina. The net effect of the plaintiff's position would be to have me hold that there is coverage for injury occurring on any portion of an insured premises where the insured seeks liability insurance for business A although the injury occurred in an area of the premises where business B operated and where business B is not even mentioned in the policy or the negotiations for the insurance. In effect policies would have to explicitly say in these circumstances there is only coverage for accidents arising out of business A.
For the reasons previously stated this would not be a fair interpretation of this policy and would impose a court written policy on an industry which it is ill equipped to do. In other words the reasonable expectations of a layperson must be understood in terms of the reasonable expectations of person in this industry — the restaurant business — who applies for insurance as a restaurant and whose premiums are determined by the volume CT Page 4606 of restaurant business. No reasonable layperson (1) applying for this type of insurance as a restaurant (2) being told in the policy that representations as to type of business are relied upon by the company (3) understanding that the premium was to be determined by the volume of restaurant business — no such person acting reasonably could then assume there would be coverage for an accident at a non-restaurant business activity, even though it is on the same premises, where the financial activity or gross sales of that non-restaurant activity is not taken into account in determining the premium — or at the very least where it is not even factored into the "classification" that determines the amount of the premium (see Declarations Page 1).[2]
In other words I do not think a reasonable layperson should expect that he would get something for nothing then have courts effectuate that purpose by in effect rewriting policy terms.
This type of policy, I believe, tries to accommodate competing interests or needs of insurers and insureds in the field of commercial liability insurance. It gives premise wide coverage where a particular type of business activity is conducted on those premises Hopefully this can avoid some hairsplitting disputes as to whether the accident resulted from the particular business operations. But such a policy does not provide coverage for accidents associated with business activity different from the business activity for which coverage was initially sought. In that way the insurer can calculate its risks and thus determine its premiums on a rational basis. Permitting this interpretation of the policy conforms with policy language, is reflective of the facts and circumstances surrounding the procurement of the policy, and does not violate any ameliorative rules of interpretation created by the courts to monitor insurance contracts. I should note that the court has not found any case exactly similar to this case and the issues it raises but Wilkinson. et al v. USF G of Baltimore, 396 S.W.2d 86 (Tenn. 1965) is quite close in its ultimate analysis. Also Snader v.London Lancashire Indemnity Co., of America, 62 A.2d 835 (Pa, 1949) is of interest. There the Declarations Page gave the location of the premises and the "purpose of use" of the premises was stated to be a golf course. The policy provided for insurance against liability for accidents arising out of "hazards" which are defined as "the ownership, maintenance or use, for the purposes stated in the declarations, of the premises and all operations during the policy period which are necessary or incidental to such purposes." The court ruled "golf course" was CT Page 4607 not used to refer to the limited area laid out for that sport. What is interesting is that in deciding there was coverage for an accident not arising in the golf course area the court considered the question of how premiums were calculated as an important basis of its decision. The court held that where the term "golf course" in the policy was used as descriptive of the leased premises of the insured generally but the premium was collected on the basis of gross income received from all undertakings operated by the insured including a restaurant, recreation hall, and bowling alleys etc, the insurer's liability was not limited to accidents occurring on acreage constituting the golf course proper, but included an accident occurring in the bathhouse leased by the insured. This case is a stark example of judicial policy creation but I take it even this court would find difficulty in holding that premiums and their method and source of calculation could be used against the companies to expand the scope of coverage but not in their favor to limit the scope of coverage.
Finally the court is not persuaded by the arguments presented by the plaintiff to try to establish coverage in this case. The plaintiff has reference to deposition testimony regarding communications made by Mr. Schram to Ms. Zalman an employee of the insurance broker Fittelson regarding Schram's expectations as to coverage. Any communications become relevant in this context only if they are referred to the insurer. The only "communication" of this sort here is the application submitted for the insurance to Associated Restaurant Management Insurance Trust. I have reviewed that application and for the reasons stated do not believe it supports the plaintiff's position. We all live in hope but the reasonableness of that hope or expectation in the context of contract formation should be tested by critical communications made to the other party to the contract.
Cases like Heyman Associates v. Insurance Co. of Pa.,231 Conn. 756, 770 (1995) and Western World Ins. Co. v. Stack OilInc., 922 F.2d 118, 121 (PA. 1990) are not really on point. Those cases stand for the broad proposition that: "Where recovery under a policy turns on the interpretation of an exclusionary clause, the insurer bears the burden of demonstrating the loss is excluded under the express terms of the policy," id. at p. 121. The issue involved here is not the interpretation of an exclusionary clause — analysis of such clauses assumes the risk is otherwise covered but that is the very question that has to be CT Page 4608 decided here. As the defendant RLI notes "before the need for an exclusion arises there must first be coverage within the defined scope of the policy," McMahon v. Boston Old Colony Ins. Co.,
412 N.Y.S.2d 465, 467 (1979) cited by Hammer v. Lumberman's MutualCasualty Co., 214 Conn. 573, 589 (1990). Reliance on Heyman, andWestern World would involve the court in circular reasoning since the court would have to presume what is in issue — that their is coverage — and in effect force the defendant to rebut a presumption that has not been established. The same can be said of the, plaintiff's argument that since the dock area was part of the premises and since the premises were insured and nothing excluded the premises then there must be coverage. Again this is not territorial area coverage if there could be such a thing (apparently there is, see Dorre v. Country Mutual Ins. Co.,363 N.E.2d 464 (Ill, 1977), Kahle v. Turner, 420 N.E.2d 127, 131 — this is commercial liability insurance. The plaintiff's analysis would in effect say I must ignore the latter fact, that the Declarations page lists the business as a restaurant, that premiums are determined according to that classification, and that Section IV paragraph 6 underlined for the insured that the representations on the Declarations page were the basis for contract formation, i.e. the issuance of a policy.
The plaintiff does make the interesting point that the RLI policy exclusions include bodily injury or property damage arising out of the ownership, maintenance use or entrustment to others of any aircraft auto, or watercraft owned or operated by or rented or loaned to any insured." The plaintiff argues that use of aircraft would not "normally" be considered in connection with a restaurant's operation nor would such items be disclosed on the application for exclusion. The plaintiff then goes on to argue that the specificity of the exclusions indicates RLI did consider what operations and activities did not wish to cover and that it limited coverage through use of exclusions. RLI could have easily drafter an exclusion to cover the marina contingency; the dock area and marina operations are not contained within the exclusions so they are covered and any ambiguity in this regard must be interpreted against the insurer (p. 10 of plaintiff's reply brief).
The "coverage form" in which this language appears is a generic document apparently applying to all commercial liability policy no matter what the business. Also although "normally" aircraft or watercraft would not be associated with the operation of a restaurant business it is not uncommon for insurers to try CT Page 4609 to exclude coverage for high risk activities in which otherwise covered businesses might wish to engage. I still do not think it is appropriate to define the scope of coverage by searching out the appropriate implications to be attached to exclusionary clauses. Such an approach would in effect skewer the burden of proof allocation in these insurance cases; the insured I take it still has the burden of proving he is covered under the terms of the policy, cf. Mycek v. Hartford Accident Indemnity Co.,128 Conn. 140, 142 (1941); Preferred Acc. Ins. Co. of N.Y. v. Grasso,et al, 186 F.2d 987, 990 (CA 2, 1951)
Unfortunately if I am correct in my analysis an innocent party, the plaintiff may be left without recourse for his injuries. But the fault for that lied with the non-insurance company defendants for not procuring adequate insurance and not being able to reimburse Mr. Cooper for his losses. I cannot shift that burden to these companies.
On the above indicated basis and confining myself to the terms of the policy will deny the plaintiff's motion for summary judgment and grant the cross motions for summary judgment of RLI and National Union Fire Insurance Company.
Corradino, J.